Thank you, Your Honors. May it please the Court. I'm Ronald Hamm here on behalf of the putative class and the named plaintiff, James Fahey. This case follows directly from what Mr. Streets just said. This is a case where we, in fact, have not joined issue with the other side. So if I can accomplish one thing today, I'd really like you to understand our theory of the case, because the central theory of the complaint is one that the district judge has ignored and that they ignore in their briefs. So if you could give me a second, I really just want to set up that theory. Counsel, you'll need to speak up just a little bit. We're having some difficulty hearing you. There's two theories of liability in the complaint. Everybody agrees this is a case where they made a lot of statements that turned out to be false. They said these drug trials are magnificent. They proved this drug is good. It turned out the trials were poorly conducted. And so the false statements, to go back to the questions last argument, are in paragraphs 206 to 246. There's more than a dozen of them. Counsel, you're going to have to speak up and you're going to have to slow down. Everybody agrees that those statements turned out to be false. The only issue in the case is Cyanar. This is a case about Cyanar. We have two reasons to think that what they said satisfied the Cyanar standard. The first one is intentional exaggeration. The things that they said about the studies suggest a degree of verification robustness that was objectively not true at the time they said it. And that's a really simple theory that I think is almost irrebuttable. The second theory is this really interesting theory about recklessness that has to do with releasing data with reckless disregard for the fact that it might be false. I'd like to talk about the first central theory of the complaint versus the second. So I'm reading from one of their press releases, which is at Excerpt of Record 89. The compelling results from this rigorously designed trial clearly demonstrate, they don't suggest, they demonstrate that the combination of this drug and that drug is more active in treating second-line non-small cell lung cancer. This is transformational data from a robust double-blinded placebo-controlled proof-of-principle trial. If my daughter wrote that in her science report in high school, she would get a failing grade given what the actual facts were. Now, they may not have known. Well, that was a little bit of a cheat there. Given what the actual facts were, yes, but they didn't know what the actual facts were at that time. Given what they knew. They had CSM running this contract. It was a responsible contractor, and they had the study, and the study, they seemed to have represented what the results of the study said. They may not have known on that date, the day that the study was unblinded, they made that particular press release, what the problem was. Or they may not have known specifically that there was a problem. But what they did know, what they absolutely knew, is that those data were preliminary and had not been verified in any reasonable way. And the way that they described those data would have suggested to a reasonable investor that the data was something that they knew it was not. They had not performed the simplest possible tests to see whether the data proved anything at all. And when those tests... And what creates the duty to verify? There is no duty to verify. There is no duty to verify? There is no duty to verify. This is not a case about a duty to verify. This is a case about making truthful statements. They can release anything they want. They can release a pile of data and say, we've got some data here. You should look at it. They can release a pile of data and say, look at this data. It shows X, Y, and Z. But what they did is they said things about the data that were false. They said things that would have caused a reasonable investor to think that they had done what they had always promised they would do. They had promised that they would conduct trials in accordance with the clinical standards that the complaint sets forth. The long, detailed list of more than a dozen specific standards that were violated in this trial. They promised people that they would comply with them. Investors who heard these statements... That's why they should bring a breach of contract action against CSM. And they did. Exactly. But what they told investors is that these data are transformative. These data are robust. This study was very well done. These data change what we know. The data didn't change anything because no one had checked in the simplest possible way to see if they were verified. You can see the difference between what they said in their press releases and what the lawyers say in their briefs. What the lawyers tell you, they say things that are true. They say it's interim data. It's data that hasn't been finally prepared to show to the FDA. What we know is this data was not in a situation where it yet could be submitted to the FDA, because it hadn't yet been verified in the simplest possible ways. So when they told investors that this was transformational data from a robust, double-blinded, placebo-controlled Phase 2 trial, they knew that that wasn't true. They knew it wasn't transformational data. They knew that they had not checked it yet in a way that would make it transformational. I guess I don't understand what you mean by it was not transformational. What did they think that they meant by transformational? I think an investor would think for it to be transformational, you'd have to have the basis that people in the industry would expect you to have for knowing that the data actually proved what it was intending to prove. But you just told me that they didn't have a duty to verify, so now I really don't understand your argument. They don't have to verify it before they release it, but they can't release it and say in a way that suggests to investors that they've done something we haven't done. They can release unverified data. Well, they didn't say they had verified it. They said they had really good data, and the data was transformational. Right, and I think a reasonable investor would think really good and transformational means something other than the information that just got spit out of the computer that no one's looked at yet. If you already told me, counsel, that they don't have a duty to verify, I'm really puzzled as to why an investor would be misled by that information. An investor is going to listen to what they say and ask themselves, what does this suggest to me? An investor that's familiar with the way pharmaceutical trials work. And if you were the CEO of this company, you might have said, we've just hit gold and I need to plow all of my kids' college savings back into Peregrine Pharmaceuticals. I mean, I'm just not seeing where the deception is here. The deception is, if you were a reasonable investor and were familiar with the way that pharmaceutical trials work, and you heard the words transformational data from a robust, double-blinded, placebo-controlled trial, you would think that someone had done more than they had done. You would think that someone had checked just, for example, to see if the people who were in the placebo trial – What statute, what rule, what case, what industry standard would I know as an investor to go to look at to understand that you already told me, again, there's no duty to verify. And if there isn't a duty to verify, I'm having a very hard time figuring out, as a reasonable investor, what I should have understood from that language. Okay, so the standards that we describe are in paragraph 249 of the complaint, which is an excerpt of record 103 to 107. It describes all these things that they're supposed to do, and it describes the fact that they've consistently promised investors that they're going to do them. So they don't have a duty to verify. They have a duty to speak accurately. Our central point is that when they say it's transformational and robust, that means this is data that's been produced the way you would expect. It's not something that just got spit out of the computer and might be, on its face, obviously not reliable. And we have people that have testified, the confidential witnesses that have said they think that, on its face, the data had problems with it that you would have seen just from looking at the raw numbers. So our central theory is you could not have described the data so strongly, giving investors the impression that the data had been prepared and assessed more carefully than was the fact without misleading investors. And so all that has to be proven for that to be valid is for us to show that investors who read this press release would have thought that they meant X when, in fact, they knew X was false. And I think the complaint adequately alleges that. So it's a matter of would an investor who heard that, who was familiar with the way they're supposed to conduct studies, have thought what if they had said instead transformational, that we got the report from this independent agency that's approved by the FDA and they gave us really good news, good news. I think you have a point where you have to decide whether the statement is sufficiently strong that it would cause a reasonable investor to be misled. And the question also is you have to get to the point of whether it's cyan or where they are intentionally or recklessly or with deliberate recklessness saying something that is false. But if it's really good they said that instead of using transformational, would that have been the case? Well, I think really good isn't as strong as transformative. I think you could say really good. I think you could say positive. The briefs all say interim positive data, which I think is hard to quarrel with. The data is interim. The data hasn't been tested in the most basic way. The data is something that gets spit out of a computer. No one's looked at it to see if it actually on its face suggests anything positive other than the look at the right level of the output. The p-value is high. We should just say it's good. That's all they've done. The investors would think before you said it was transformational you had done more. We've alleged that. Investors would believe they had done more based on those statements. I think we're entitled to prove that. Is transformational some kind of term of art? I think that transformational is a really strong term. It's better than really good. It's up there with hit the gold mine. And you have the overlap of dozens of these statements. It depends how you define a reasonable investor. I think that's right. But those are questions of fact. I think the problem is you have to assume for scientific purposes that everything we've said in the complaint is true. So you have to assume that a reasonable investor, if they heard transformational, would believe that this data had had more assessment made of it than they had. And if you read through our brief, you'll see they said a lot of things about the extent to which it had been verified. So a reasonable investor who read all those statements we submit would have known, would have expected something, and they would have known they would have expected it that wasn't true. So that's our central theory of the case, and it has to do with what a reasonable investor would have thought if they'd read those press releases. We've alleged what they would have thought, and we've alleged it would have been material to them. I think we're entitled to prove what the investor would have drawn from these statements. You have to assume all the stuff that we say is true about what investors would have thought about it. If I could talk. If I read your complaint right, it didn't seem to me that you alleged that the defendants made any statements they knew to be inaccurate or statements that were completely without basis. Well, completely without basis and inaccurate are two separate things. I think it's our contention that these statements were inaccurate and were known to be inaccurate because they knew that the data were not transformational because the data were primitive. That's in your complaint? Yes, I think that's the central theory of the complaint. It lists all the statements. Well, my worry is that it seems to me that from reading the complaint that what they were saying were statements about tests in the phase, if you will, made in the reports, if you will, in this phase 2 trial, and that the things that they found in the phase 2 trial, they didn't exaggerate those things. Well, I think they did exaggerate them. How did they exaggerate them? They didn't exaggerate them by changing the numbers. They didn't say the p-value is 0.02 and it's actually 0.5. So what did they do to exaggerate them?  I believe that they had actually checked the data in a way that you could use it for something and treat it as worth anything. Our complaint alleges that the data was not in a form that you could have even given it to the FDA because it hadn't been checked yet. If it's not good enough for the FDA, why is it good enough for investors to assume it's worth something? I'd like to say a few things about our second theory of our complaint, which is the deliberate recklessness theory. This also is a theory that the district court largely didn't address, and they don't address it in our complaint. Well, they didn't address it because he said you can't get to deliberate and recklessness because you can't prove the first theory. So that's what he said. Which logically doesn't make any sense. The second theory is that when they received the data at the time of the in-blinding, they extremely departed, and extreme is extreme, extremely departed from ordinary care so they had a deliberately reckless disregard for the possibility there were errors. And this really tracks very closely the Fifth Circuit's opinion in Spitsberg. It's much like Spitsberg. I think it's much like the matrix case you just talked about. We detail in Section 249 of the complaint, paragraph 249, 16 specific standards with which they promised to comply, all of which are it's our job to make sure this is done right. It's of no interest to the FDA or the industry that we hired somebody else to do it and they did it wrong. We are responsible for doing it right. There's 16 of these standards we detail from which they departed. It's just like in Spitsberg. When someone says reserves, their complaint alleged that, well, you tell investors in the oil industry they mean reserves, well, people in the oil industry think reserves means that you've done X, Y, and Z tests. Here they had departed so far from the standards of the way pharmaceutical trials are supposed to be conducted that there was a reckless disregard for the possibility of what they were saying had substantial errors in it. Mr. Mann, you're down to one minute. Would you like to reserve some time? I would. Okay. Thank you. Good morning, Your Honor. Koji Fukumura. May it please the Court, cancel. I'm appearing on behalf of Peregrine Pharmaceuticals and the individual defendant appellees. Let's start first, if we could, and pick up on the question, this exaggeration. So in May, the trial is unblinded and the company receives from Sintrac, whoever, a CRO, the biostatistician, the data, the statistical analysis, and the TLS, the tables, lists, and graphs. And that just shows the outcome, the statistical analysis of the class. And what does it show? It shows that the placebo, docetaxel, a chemotherapy drug, reduced tumors. The primary endpoint is tumor reduction at a rate of 7.9%. The first treatment arm, the low-dose arm, had a response. So the placebos here had a response that was roughly double, 15%. And the high-dose had 17.9%. So you have the placebo, low-dose, and high-dose. What about that? And this is a doubling of the tumor response rate. It's the doubling of the tumor response rate for the most avaricious type of cancer right now. Lung cancer is the biggest killer. Non-small lung cancers are 85% to 90% of lung cancers. So is this a transformational? Well, okay, we can quibble about transformational. Terrific. The question is, was it exaggerated? And the point is, of course not. That's what the data said. That's what the data said. And counsel, I believe what counsel is saying, he says it was a poorly conducted trial. This was an FDA-approved investigational plan and protocol. There's not a single confidential witness that says it was something other than that. They said, well, the data was preliminary and unverified. Well, again, there's a protocol. The FDA approved it. The company went out and the company said, we can't run these trials. We need to hire clinical research organizations like CSM. The company then went out and hired CSM, entered into agreements with them that they would follow the protocol. So there's literally not a single factual evidence, piece of evidence, in this complaint that says anything other than that. So I'm going to talk a little bit about scienter, because it's clear that that's the big issue in this case. They have to show that it's a form of knowing and intentional misconduct. And the plaintiff claims that the district court erred in requiring actual knowledge of flaws in the study, and the plaintiff is wrong. In citing the standard, they cited Zucco Partners, cited the standard that Your Honor articulated earlier, that there plead a highly unreasonable omission involving an extreme departure from the standards of ordinary care that is either known or so obvious that the actor must have been aware of it. And the court specifically zoned in on this and said, the crucial question is whether defendants knew there were major discrepancies in the Phase II clinical trial or at least put on notice that there might be. So again, let's just stop there. They've cited sort of general, very general portions of the ICH, the International Conference on Harmonization Standards on Good Clinical Practices, that say things like, you know, you should have an investigational plan and a protocol and you should hire, to the extent that you can't do it yourselves, hire people to do it and make sure they do it by entering into agreements with them. And that's what the company did and that's what they thought happened. But one thing is for sure, there is no standard that says, by the way, when you get this data from your biostatistician, in the tables, lists, and graphs and the statistical analysis, you need to stop and you need to double-check every single thing, every single clinical research organization that you hired did and make sure they did it correctly. They haven't cited a case that says that. And, of course, they haven't cited anything in the protocol, in the investigational plan, in any of the sort of generalized statements about the good clinical practices that would require this company to do it. And, in fact, there are none. Again, on this exaggeration, I understand now that they've abandoned the duty to verify argument, and that's fine, but the exaggeration argument is really a duty to verify in sheep's clothing, isn't it? What they're saying is, well, you couldn't have said what was plainly written in the statistical analysis. They're not saying that it said one thing and we said something else. The statistical analysis and the tables and lists and graphs come in, they say X, we report X. On its face, a doubling of tumor response looks good. Is that terrific? Is that transformational? For people who are doctors, oncologists, for people who are suffering from these cancers, you bet. Where is it anywhere in the record that someone said this defendant, this speaking defendant, was put on notice that there was a problem? We know from the 28-J letter they filed that no one knew until September 20, 2012, that when CSM admitted for the first time that one of their employees, Janet Bleeker, unilaterally switched the treatment codes, she didn't tell anyone at CSM that she did it. She didn't tell anyone at Peregrin she did it, and she said that it was a deviation from the contract that that company signed with Peregrin pursuant to the protocol. There is nothing, there is not a single confidential witness statement that says, by the way, they knew about it, there is some PK or HACA testing. It showed X, that someone who was in the placebo arm tested positive for antibodies that relate to bavitoximab. And then, it's not just that the test revealed it, that they went to a speaking defendant and said, hey, did you know about this? And then, it's not just that they knew about it, but what did they do? Did they, at that point, act unreasonably? Was what they did an extreme departure? Well, they don't even have the first thing. They don't even have a test during the really critical time period, May 21, when the first study was pressure releases reported, to September 7, when the last pressure release went out about the study. There's not a single piece of evidence in there that anyone revealed through a PK test that there was an issue. Does Your Honor have any questions for me? I don't think there are any questions here. All right. I'm going to. Okay. Thank you very much, Mr. Fukumura. Mr. Mann. I'd like to say three things briefly, Your Honors. First, they dismiss these clinical practices as really vague and conclusory. They're not vague and conclusory. They're at paragraph 249. They're very detailed. You should read them if you think that we haven't alleged that there are specific standards that people consider binding that people reasonably would have thought had been filed that they didn't comply with. Secondly, to the idea that no one suggested there was anything wrong, this is in the complaint. Confident witness stated she was shocked at what Peregrine initially reported regarding the data from the Phase II trial. CW2 stated that the company overstated the positive data of the data, and the final positive data that the company promised was not present. CW2 further stated that the announced Phase II trial results were incredible and hard to believe. Which paragraph? That's paragraph 128 at excerpt of Record 75. So I think that does suggest that there was something in the data. She's the one who was shocked, but she left before CSM ever gave them this report. She left in July of 2011. She was employed as Senior Vice President of Manufacturing, which suggests that she has, speaking of the Zucco standards, she's in a position to understand how they did things. But she left 10 months before CSM even provided the results to Peregrine. She is commenting on what was released publicly. She's saying, I see the information coming to the public, and the public, I see it, and I have no know what to make of it because I had a senior position when I was there. Thank you very much, Mr. Mann. Thank you. All right. We thank counsel for the argument. That completes the calendar for the day. The court is in recess.
judges: Pregerson, Bybee, N.R. Smith